E-FILED
Monday, 08 March, 2021  02:40:21 PM
Clerk, U.S. District Court, ILCD

## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS, SPRINGFIELD DIVISION

JEFFREY E. LAKE,  )
  )
  Plaintiff,  )
  )
  v.  )  No. 19-cv-3273
  )
ANDREW SAUL, Commissioner  )
of Social Security,  )
  )
  Defendant.  )

## <u>OPINION</u>

TOM SCHANZLE-HASKINS, U.S. MAGISTRATE JUDGE:

Plaintiff Jeffrey E. Lake appeals from the denial of his application for Social Security Disability Insurance Benefits (Disability Benefits) under Title II of the Social Security Act.  42 U.S.C. §§ 416(i) and 423.  This appeal is brought pursuant to 42 U.S.C. § 405(g).  Lake filed a Brief in Support of Motion for Summary Judgment (d/e 12).  The Defendant Commissioner filed a Motion for Summary Affirmance (d/e 16).  Plaintiff filed a Reply Brief to Defendant's Motion for Summary Judgment (d/e 17). The parties consented to proceed before this Court. <u>Consent to the Exercise of Jurisdiction by a United States Magistrate Judge and Reference Order entered April 29, 2020 (d/e 11)</u>.  For the reasons set forth below, the Decision of the Commissioner is affirmed.

## STATEMENT OF FACTS

### Background

Lake was born on June 1, 1972.  He secured a GED and previously worked as a truck driver.  He stopped working in 2011 and filed for Disability Benefits on April 21, 2016.[1]  Lake suffered from degenerative disc disease status post cervical fusion with radiculopathy and myelopathy, osteoarthritis, elbow degenerative joint disease, bilateral trigger thumbs, fibromyalgia, chronic pain syndrome, polyneuropathy, coronary artery disease and ischemic heart disease status post multiple stent placements, and obesity.  He alleged that he became disabled on October 1, 2014 (Onset Date).  The last day that Lake qualified for Disability Benefits was December 31, 2016 (Last Date Insured).  Certified Transcript of Proceedings before the Social Security Administration (d/e 8) (R.), 15, 17, 25, 41, 66.

### Evidence Prior to Evidentiary Hearing

On October 28, 2013, Lake saw his primary care physician Dr. Jason Sharp, M.D.  R. 496-97.  Lake saw Dr. Sharp for sinusitis and reported that his back pain was stable, but he had flare-ups of uncontrollable pain.  He

---

[1] Lake protectively filed a prior application for Disability Benefits on April 15, 2011.  R. 75.  The record does not indicate the outcome of that application.

was compliant with his medications and did not have any side effects.

Lake said his pain specialist switched his pain medication from

hydrocodone to Oxycontin and his pain has been worse since the change.

R. 496.  On examination, Lake appeared uncomfortable.  He had 4/5

strength in his upper extremities including finger flexion and a weak hand

grip.  Lake's sensation to touch was diminished in both hands and his

balance was impaired. Dr. Sharp assessed chronic pain.  R. 497.

On January 28, 2014, Lake saw Dr. Sharp.  R. 482-84.  He

complained of worsening pain and leg weakness and rated his pain as a

10/10.  On examination, Lake was uncomfortable, his heart and pulmonary

functions were normal, his motor strength was normal in his left upper and

lower extremities, and his straight let testing was negative.  Lake's spine

had decreased lordosis with tenderness from T-10 to L-5 and spasms from

T-11 to L-4.  Extension, flexion, and rotation of the spine were restricted

and painful.  His sensory exam of his spine was normal.  Dr. Sharp referred

Lake for a surgical consult.  R. 483.

On March 19, 2014, Lake saw orthopedic Advanced Practice Nurse

Nicollette Haurbrich, ANP, FNP-BC, for chronic low back pain.  Lake

reported that in 2008 he fell 15 feet.  After this fall, he underwent a cervical

discectomy and fusion surgery in 2008.  He has had chronic low back pain

since the 2008 fall.  He had loss of strength in his legs, his pain medication dulled the pain, and he was taking eight hydrocodone/acetaminophen tablets a day.  He also received some benefit by using a home TENS unit every other day.  His primary care physician put him on a 10-pound lifting limit.  R. 320.  Haurbrich reviewed imaging of Lake's spine.  X-rays taken January 29, 2014 showed multi-level degenerative disc disease with osteophytes, end-plate deformities at many levels, and no acute fractures or subluxations.  A December 8, 2014 MRI showed loss of disc height and no significant stenosis at L1-2, L3-4, and L4-5; and loss of disc height, mild diffuse disc bulge, and facet arthropathy, but no significant stenosis at L5-S1.  R. 320-21.  Lake also had a history of fibromyalgia.  R. 321.  On examination, Lake was 68 inches tall, weighed 229 pounds, and had a body mass index (BMI) of 34.83.  R. 319.  Haurbrich found no evidence of cardiac ischemia.  He had normal posture and gait; normal strength, muscle tone, and range of motion in the lower extremities with minimal to no pain with rotation of the hips; and a normal spinal examination except for a positive Hoffman sign related to the prior surgery and mild to moderate discomfort on palpation of the lumbar spine.[2]  Sitting straight leg

---

[2]Hoffman test is a test of reflexes in the fingers.  See Dorland's Illustrated Medical Dictionary (32nd ed. 2012) (Dorland's), at 1712.

testing was positive bilaterally.  Lake had 5/5 strength throughout his lower extremities and reported pain with flexion and extension of his lower extremities.  Haurbrich assessed low back pain, lumbar radiculopathy, lumbar spondylosis, and multi-level degenerative disc disease and end plate deformities.  She recommended having another MRI of Lake's lumbar spine and directed him to perform home exercises he received from physical therapy.  She also recommended weight loss.  R. 322-23.

On April 3, 2014, Lake saw orthopedic surgeon Dr. Nitin Kukkar, M.D., for a consultation.  R. 314-16.  Dr. Kukkar noted that Lake had a history of a spinal cord injury with myelopathy and had undergone a surgical discectomy and fusion at C6-C7.  Lake reported continuing back pain and balance issues and rated his pain at 7/10.  He had been taking hydrocodone for three years.  On examination, Lake was moderately obese. Hoffman's sign was positive.  Lake had balance problems and was unable to perform Romberg sign and could not heel or toe walk.[3]  Lake was stiff sitting up on the examination table.  Extension and flexion of the lumbar spine was restricted.  Dr. Kukkar stated that Lake's x-rays and MRI showed severe degenerative disc disease at multiple levels of Lake's

---

[3] Romberg's sign is a test of balance with feet close together and eyes closed.  See Dorland's, at 1715.

lumbar spine causing foraminal stenosis at multiple levels and central

stenosis at almost all levels.  Dr. Kukkar concluded:

> ASSESSMENT AND PLAN:  I had a long discussion to him
> regarding pain pills and good back health. At this age, whatever
> we have to do will have to fuse the lumbar spine and even up to
> the thoracic spine. Now, this is going to create a lot of problems
> because the patient is only 41 years old, but this is about the
> only solution that we can do for the stenosis as well as the
> degeneration and arthritis. I talked to him about quitting pain
> pills and going on Aleve rather than taking hydrocodone and
> why the hydrocodone fails chronically.  I told him to avoid
> surgery as long as possible as well.

R. 315.

On April 17, 2014, Lake saw cardiologist Dr. Irving Schwartz, M.D.  R.

474-76.  In January 2009, Lake had six cardiac stents placed in his heart.

Dr. Schwartz noted that Lake smoked.  Dr. Schwartz said,

"Cardiovascularly things are stable other than the tobacco use."  R. 474.

On examination, Lake's heart and pulmonary exams were normal, his

motor exams were normal for his upper and lower extremities.  Dr.

Schwartz assessed atherosclerotic heart disease of the native coronary

artery without angina pectoris.  Dr. Schwartz adjusted his blood pressure

and cholesterol medication and recommended that Lake stop smoking.  R.

476.

On July 29, 2014, Lake saw Dr. Sharp. R. 372-75.  He complained of

increasing pain.  He denied any shortness of breath, chest pain, or lower

extremity edema and said he had worsening lower back pain, lower extremity pain, lower extremity paresthesia, and lower extremity weakness. He did not sleep well and did not engage in much physical activity.  He used a riding mower to mow his lawn and took his boat "out on the river." He could walk half a block, sit for five to 10 minutes, and stand for 10 to 15 minutes. His pain was 6/10 at the time of the visit and ranged from 6/10 to 10/10.  Lake took 7 to 10 hydrocodone tablets per day along with muscle relaxants and used a TENS unit four times a week.  He stated that Dr. Kukkar recommended back surgery or medical marijuana.  R. 372.

On examination, Lake was 5 feet 8 inches tall, weighed 233 pounds, and had a BMI of 35.43.  R. 375.  Lake was uncomfortable.  He had bilateral 0-trace+ pretibial pitting edema.  His heart and pulmonary exams were normal.  His upper extremity bilateral  strength was 4/5 in the biceps and triceps and 5/5 in finger flexions.  Dr. Sharp assessed lumbar spondylosis and continued Lake's hydrocodone/acetaminophen medication.  Dr. Sharp noted, "Recommending walking with the cane in left hand."  R. 373.

On December 3, 2014, Lake saw Dr. Sharp.  Lake reported stable back pain and stiffness.  He took six hydrocodone a day but had not refilled his prescription for muscle relaxants.  He denied any side effects from his

medication and was sleeping "okay."  R. 464.  On examination, Lake was
mildly uncomfortable. His heart and pulmonary exams were normal.  He
had 0-trace+ pretibial edema.  R. 465.

On March 4, 2015, Lake saw Dr. Sharp.  R. 363-65.  Lake
complained of worsening back pain.  He fell a month earlier and then "lifted
something heavier than he should have."  His pain level was up to 10/10.
Hydrocodone and muscle relaxants decreased the pain for about one and
half hours.  R. 363.  On examination, Lake appeared chronically ill and
uncomfortable.  His heart and pulmonary function exams were normal.
Lake had bilateral 0-trace+ pretibial edema.  Dr. Sharp deferred
examination of Lake's back and neck and assessed chronic pain.  Dr.
Sharp prescribed the antidepressant duloxetine (Cymbalta) and fentanyl.
Dr. Sharp recommended that Lake lift no more than 20 pounds.  R. 364.

On May 12, 2015, Lake saw Dr. Sharp.  Lake reported that he was
doing well, and his neck and back pain improved.  His average pain level
was 4/10 and his maximum pain was 6/10.  Lake was compliant with his
medication and denied any side effects.  R. 457.  On examination, Lake
appeared mildly uncomfortable and chronically ill.  His heart and pulmonary
exams were normal.  He had 0-trace+ pretibial edema.  His elbows showed
bilateral tenderness, full range of motion, and decreased strength

secondary to pain.  Dr. Sharp administered steroid injections into Lake's elbows.  R. 458.

On June 2, 2015, Lake saw cardiologist Dr. Irving Schwartz, M.D.  R. 356-58.  Dr. Schwartz noted that Lake had a history of the placement of six cardiac stents in January 2009.  R. 356.  Dr. Schwartz' examination of Lake's heart was normal, his pulmonary examination was normal, and his upper and lower extremity motor function exams were normal.  Dr. Schwartz assessed arteriosclerosis of the coronary arteries, found no indication to suggest recurrent of coronary artery disease, and recommended that Lake stop smoking.  Lake told Dr. Schwartz he could not exercise due to his back pain.  R. 358.

On September 21, 2015, Lake saw Dr. Sharp.  R. 450-53.  Lake reported stable back pain and rated his pain as 9/10.  He reported numbness in his right lower extremity.  He was using a long acting fentanyl patch every three days, and five to six hydrocodone per day.  He reported constipation as a side effect of the medication.  R. 450.  On examination, Lake appeared uncomfortable but not acutely ill.  His heart and pulmonary exams were normal, and he had no peripheral edema.  Dr. Sharp increased the dosage of the fentanyl patch.  R. 451.

On November 25, 2015, Lake saw Dr. Sharp.  R. 348-51.  Lake denied having any shortness of breath, chest pain, or lower extremity edema.  He had no change in his low back pain and had trouble walking some days.  His elbow pain also was unchanged, and he rated his pain at 8/10.  Lake was taking fentanyl and duloxetine for his pain and said he was not experiencing any side effects from the medication.  Lake reported that he went hunting and the movement exacerbated his pain.  R. 348.  On examination, Lake appeared chronically ill but not uncomfortable.  Lake's heart and pulmonary function were normal.  He had tenderness in both elbows and his left calf lacked a palpable cord.  Dr. Sharp assessed myalgia and myositis.  R. 349-50.

On December 1, 2015, Lake saw cardiologist Dr. Schwartz for a follow up.  Lake continued to smoke and limited his activity due to back pain.  He was compliant with his medication.  R. 443.  Lake's heart and pulmonary examinations were normal.  His motor examinations were normal in all extremities.  Dr. Schwartz continued his medications.  R. 445.

On December 3, 2014, Lake saw Dr. Sharp for hypertension.  Lake's blood pressure control was poor and he reported headaches.   His back and neck pain were stable, and he was sleeping okay.  He was taking six hydrocodone tablets a day and not taking any muscle relaxants.  He was

not adhering to his medication regimen and had no side effects from his
medication.  R. 366.  On examination, Lake was mildly uncomfortable.  His
heart and pulmonary exams were normal, and he had 0-trace+ pretibial
pitting edema.  R. 367.

On February 9, 2016, Lake saw Dr. Sharp.  R. 439-41.  Lake
complained of moderate elbow pain, decreased range of motion in his
elbows, and weakness in his hands.  R. 439.  On examination, Lake
appeared chronically ill and uncomfortable, but not acutely ill.  His heart
exam was normal.  During his pulmonary auscultation Dr. Sharp heard
rhonchi over the base of his left lung.  Lake had bilateral restricted range of
motion on flexion and extension of his elbows. Dr. Sharp administered
steroid injections into Lake's elbows.  R. 441.

On February 26, 2016, Lake saw Dr. Sharp with allergic rhinitis and a
rash.  He was not sleeping well but denied having any headaches.  Dr.
Sharp discussed treatment options for the rash.  R. 338.

On May 17, 2016, Lake saw Dr. Sharp.  R. 413-14.  Lake reported
fatigue as a side effect of his medication.  On examination, Lake was
chronically ill and uncomfortable, his heart and pulmonary exams were
normal, his muscle strength and tone were normal except for 4/5 strength
in his right triceps, left biceps, and bilateral grip strength.  R. 414.

On May 22, 2016, Lake completed a Function Report—Adult form.
R. 242-49.  Lake lived in a mobile home with his family.  He had difficulty
getting up in the morning because of his pain and sometimes took several
hours to get out of bed and get moving.  He and his wife and step-daughter
took care of the family pets.  His pain affected his sleep:  some days he
could not sleep at all day or night, and some days he slept all the time both
day and night.  Lake's wife helped him bathe, dress, and put on his shoes
and sometimes he needed help getting off the toilet.  R. 242-43.  His wife
reminded him to take his pills and to shower.  His wife and step-daughter
did the cooking, household chores, and yard work.  He said his pain was
great and he fell randomly.  R. 243-44.  Lake said that he drove short
distances and that his leg went numb if he drove too far.  He paid bills and
used a checkbook/money orders, but his wife oversaw paying the bills
"cause I forget a lot."  R. 245.  He could not concentrate because of the
pain medication.  He liked to hunt, fish, and boat, but he said that he could
not do these things after his fall and injury.  He did not go places often, but
people visited him at home.  His brother came over every day and he went
to church "when my body allows me."  R. 246.

Lake said that his impairments affected lifting, squatting, bending,
kneeling, standing, walking, reaching, stair climbing, concentration,

understanding, following instructions, using his hands, and getting along with others.  Lake opined that he could lift a gallon of milk and walk 100 feet before he had to stop and rest.  He had difficulty following instructions because he could not concentrate or listen due to his pain.  R. 247.  Lake said that his doctor prescribed using a cane to walk and that he sometimes used a cane depending on his pain and where he was trying to walk.  R. 248.  He was in constant pain after his accident and fall and had no feeling in his fingers.  He fell often and had problems dropping thing.  R. 242.

On June 2, 2016, Lake had an MRI of his cervical and thoracic spine. R. 407-08.  The cervical MRI showed the prior fusion surgery, a small focal area of cord atrophy and signal abnormality at C5 due to post compression myelopathy, with no significant spinal stenosis or foraminal narrowing.  R. 408.  The thoracic MRI showed no acute abnormality or interval change from a December 8, 2010 MRI; and multilevel spondylosis with no compressive disc herniation.  R. 407.

On July 20, 2016, Lake saw Dr. Sharp.  Lake complained of neck pain and stiffness and was using a fentanyl patch once every three days. The patch worked on the first two days, but the pain returned on the third day.  He also reported more numbness in his hands and that he had no side effects from his medications.  R. 418.  On examination, Lake was

chronically ill and uncomfortable.  His heart exam was normal, and his respiratory exam was normal.  R. 420.  Dr. Sharp assessed cervical spondylosis and continued Lake's pain medication.  R. 418.

On July 28, 2016, state agency physician Dr. James Madison, M.D., completed a Physical Residual Functional Capacity Assessment form.  R. 90-93.  Dr. Madison opined that Lake could lift 20 pounds occasionally and 10 pounds frequently; stand and/or walk for six hours in an eight-hour workday; sit for six hours in an eight-hour workday; frequently stoop, crawl, and climb ramps and stairs; and occasionally climb ladders, ropes, and scaffolds.  R. 90-91.  Dr. Madison stated that Lake was limited to occasional reaching overhead bilaterally and should avoid concentrated exposure to extreme heat or cold.  R. 92.

On August 2, 2016, Lake saw a Licensed Clinical Social Worker therapist Sean Miller, LCSW, for an individual therapy session.  R. 513-14.  Lake's diagnosis was chronic pain and depression with anxiety.  He said his pain had been difficult to manage lately and he ran out of pain medication for a few days.  He had been isolating and more irritable and his pain increased the strain on his marriage.  His wife got him to reevaluate the things he had been doing lately.  He said that "he is still very active on the search and rescue team but recognizes how this impacts him long-

term."  R. 513.  Lake's mental status examination was normal, and Miller found that Lake's psychiatric condition was stable.  R. 514.

On August 19, 2016, Lake saw nurse practitioner Mary Logsdon for unresolved sinus pressure and pain.  He reported chest congestion and wheezing when he was lying down.  R. 509.  Lake's review of symptoms showed no headaches or dizziness.  R. 510.  Logsdon assessed bronchitis and a sinus infection and prescribed an antibiotic and prednisone.  R. 509.

On September 5, 2016, Lake completed a Function Report—Adult form.  R. 253-60.  Lake lived in a house with his wife and step-daughter. He had trouble sleeping because of his pain and often slept for several hours during the day because he was exhausted from lack of sleep at night.  He dressed and fed himself.  His wife shaved him and helped him in and out of the bathtub.  She sometimes helped him wipe himself on the toilet and get up off the toilet.  R. 253-54.  His wife also sorted his pills and reminded him when he needed to take them.  He did not cook or do either housework or yardwork and said that he had a 10-pound lifting restriction and he was "very unstable with my hands and my feet."  R. 256.  He sometimes drove to his doctors' appointments, but he usually rode because his legs and arms went numb driving.  His wife did the shopping and took care of paying the bills.  He did not pay the bills because he had trouble

focusing.   R. 256.  Lake tried to attend church once a month, and he

watched his step-daughter play volleyball.  He used Facebook to speak

with his son in Kuwait.  R. 257.  He did not otherwise socialize because he

was in too much pain.  R. 258.

Lake said in the Function Report that his impairments limited his

ability to lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs,

remember, complete tasks, concentrate, understand, follow instructions,

use his hands, and get along with others.  He could only lift a gallon of milk

and walk 500 feet and could not concentrate to follow instructions.  He was

afraid he would "fall randomly" because his arms and legs went numb.  R.

259.  He could not sit for too long or stand for too long because of the pain.

R. 253.  His hands and fingers were always numb, and he dropped things

constantly.  R. 253.  Lake said a cane was prescribed in 2015 and he used

that cane when he was in "very bad pain."  R. 259.  His medicines caused

drowsiness.  R. 260.

On September 6, 2016, state agency physician Dr. Sumanta Mitra,

M.D., completed Physical Residual Functional Capacity form.  R. 105-08.

Dr. Mitra opined that Lake could lift 20 pounds occasionally and 10 pounds

frequently; stand and/or walk for six hours in an eight-hour workday; sit for

six hours in an eight-hour workday; frequently stoop and crawl;

occasionally climb ramps and stairs; and never climb ladders, ropes, and scaffolds.  R. 105-06.  Dr. Mitra said that Lake was limited to occasional reaching overhead bilaterally and should avoid concentrated exposure to extreme heat; extreme cold; fumes, gases, dusts, odors, poor ventilation, etc.; and hazardous machinery or unprotected heights.  R. 106-08.

On September 23, 2016, Lake went to occupational therapy for an initial evaluation of therapy for his elbows and upper extremities.  R. 607-11.  Lake reported that his elbow pain had been worsening over the last three years.  He wore compression sleeves that provided some pain relief, but reported sharp pain with arm use, loss of extension and flexion, and weakness.  He rated his pain during the evaluation as 8/10 and his worst pain as 10/10.  The pain was aggravated by gripping, lifting, and holding a steering wheel and that lifting a cup of coffee was painful.  He also told the therapist, "'I couldn't even control the steering to mow the lawn yesterday in a rider.'"  R. 607.  On examination, Lake had either 4/5 or +4/5 strength in his upper extremities.  The therapist found evidence of epicondylitis (tennis elbow) and triceps tendonitis and also noted limited range of motion in the elbows.  Given Lake's back history, the therapist suggested a neurosurgical consult and also recommended a course of occupational therapy.  R. 608-09.

On September 28, 2016, Lake saw his therapist social worker Miller. Lake said that his pain was 10/10 due to a change in the climate and that he also ran out of his pain medication and was bed ridden for five days.  R. 600.  On examination, Lake's mental status was normal, and his psychiatric condition was stable.  R. 601.

On October 7, 2016, Lake's attorney completed a Disability Report – Appeal form for Lake.  R. 264-72.[4]  Lake's attorney represented on behalf of Lake that on August 1, 2016, his elbows started locking up and after September 1, 2016, his pain worsened and was out of control.  His elbows were worse.  R. 265.  He needed help dressing himself and he often did not get out of bed because of the pain.  R. 270.

On October 14, 2016, Lake went to the emergency room with neck and left arm pain.  He said that his chiropractor told him to go to the emergency room.  R. 564.  On examination, Lake was not in respiratory distress.  The midline of his neck was tender, his back was non-tender, his extremities were non-tender, and he had full range of motion in his extremities.  R. 563.  Emergency room personnel ordered elbows x-rays and a cervical spine CT scan.  The x-rays showed osteoarthritis in both elbows with no fracture, and intraarticular loose bodies could not be

---

[4] The form is undated.  The index to the exhibits states that the form was dated October 7, 2016.

excluded.  R. 568-69.  The CT scan showed multilevel degenerative changes and facet arthropathy; vertebral body heights were preserved; no evidence of fracture or malalignment; the central canal was patent; and the paraspinal soft tissue was normal.  The CT scan showed no osseous abnormalities.  R. 570.  The emergency room nurse practitioner assessed cervical radiculopathy.  Lake was discharged when his condition improved.  R. 563.

On October 19, 2016, Lake saw Dr. Sharp.  R. 571-76.  Lake reported worsening pain in his neck, back, and upper and lower extremities.  The pain was about the same on the right and worse on the left and he had increased tingling in his arms and legs, but no weakness or numbness.  He told Dr. Sharp that within the last five days he went to a chiropractor, but the session did not relieve his pain, and then went the emergency room.  The emergency personnel gave him Dilaudid, but the medication did not reduce his pain.  He was adherent to his medication regimen and had no side effects.  R. 571.  On examination, Lake had 4/5 strength in his upper extremities, except for normal left intrinsic finger strength and 5/5 strength in his left fingers flexion and his spine exam had a positive Hoffman test bilaterally.  Lake had 4/5 strength in his lower extremities except for some 5/5 strength in his feet and great toes.  Straight

leg raising testing was negative.  He had intact sensation and Romberg's sign was negative.  R. 573.

On October 25, 2016, Lake saw psychiatrist Dr. Valentina Vrtikapa, M.D.  R. 594-96.  Lake reported that he was stable and doing well and had chronic pain.  R. 594.  His mental status examination was normal, and his psychiatric condition was stable.  R. 595.  Dr. Vrtikapa assessed depression with anxiety and continued Lake's prescribed treatment.  R. 595-96.

On October 27, 2016, Lake had EMG/nerve conduction studies done of his upper and lower extremities.  R. 695-96.  A week before, Lake's left arm suddenly went numb and he lost grip strength in his left arm.  Lake had continuing problems with back pain and balance problems and reported that he had difficulty going up and down stairs.  The EMG/nerve conduction studies showed bilateral median entrapment neuropathies at the wrists indicating possible carpal tunnel syndrome, and possible sensory and mild motor neuropathies in the lower extremities that could suggest polyneuropathies.  R. 696.

On October 31, 2016, Lake was discharged from occupational therapy for non-attendance as he stopped going to sessions within two weeks of the September 23, 2016, initial evaluation.  R. 615-16.

On November 22, 2016, Lake saw Dr. Sharp.  R. 690-94.  Lake reported continued stable upper back pain, lower back pain, and lower extremity pain.  He denied any lower extremity paresthesia or lower extremity weakness.  He reported difficulty sleeping, fatigue, upper extremity weakness, and pain in his elbow.   Lake was not adherent to his medication regimen and denied any side effects from his medication.  He said he was not getting good pain control and that lorazepam helped with sleep.  He did not need the lorazepam on a regular basis. R. 691.   On examination, Lake was uncomfortable.  He had a normal heart and pulmonary exam.  Both elbows were tender and had limited ranges of motion, with the right worse than the left.  R. 693.  Dr. Sharp adjusted Lake's medication and discussed physical therapy options.  R. 690-91.

On January 13, 2017, Lake had a chest x-ray which showed thoracic spondylosis but no radiographic evidence of acute cardiopulmonary disease.  R. 719.

On February 24, 2017, Lake saw cardiology nurse practitioner Rachana Adhikari, NP, for cardiac clearance to have hernia surgery.  R. 673-77.  Lake said that he suffered injuries when he fell 25 feet off a truck.  He has not been active since then, but was trying to be as active as he could.  He could walk 500 to 600 feet before his legs gave out on him.  He

said he went to a club and walked up and down the stairs at the club.  He did 25 stairs three times a week.  He experienced no chest pain or shortness of breath from walking the stairs.  R. 673.  On examination, his heart and pulmonary exams were normal and he had a normal gait.  Adhikari determined that he could proceed with the hernia surgery.  R. 677.

On March 8, 2017, Lake saw Dr. Sharp, the day before his scheduled hernia surgery.  R. 669-72.  Lake reported back pain, lower extremity pain, and lower extremity paresthesia.   His lower back pain was moderately worse.   Due to the pain, he could only be active for five minutes at a time.  He did laundry but kept the loads under ten pounds.  He also had elbow pain and upper extremity paresthesia.  His average pain was 8/10 and his maximum pain was 10/10.  He adhered to his medication regimen and reported side effects of constipation and difficulty falling asleep.  The medication was not controlling his pain, and he was running out of pain medication.  R. 669.  On examination, Lake was chronically ill and uncomfortable.  His heart and pulmonary exams were normal.  Dr. Sharp increased the dosage on Lake's fentanyl patch.  R. 670.

On March 15, 2017, Lake saw cardiac nurse practitioner Rachana Adhikari, NP.  Lake saw Adhikari for a follow up after a heart catheterization.  R. 660-64.  Lake had a heart attack while in the hospital

for his hernia surgery, and Dr. Schwartz had performed the catheterization and inserted seven additional stents into his heart.  R. 657, 660, 664. Adhikari noted that "surprisingly" Lake had preserved ejection fraction and no significant wall abnormality.  Adhikari scheduled Lake for cardiac rehab and also praised Lake for not smoking after his hospitalization for the heart attack.  R. 664.

On March 22, 2017, Lake was seen by his surgeon Dr. Emmanuel Bessay, M.D., two weeks after his hernia surgery and cardiac catheterization and placement of stents.  He reported he was doing well. He was ambulating without difficulty and was returning to his activities of daily living.  R. 657.  On examination, Lake's heart rate and breathing were normal.  His incision from the surgery was healing and his neurological examination was normal.  R. 658.

On April 18, 2017, Lake saw Dr. Sharp.  R. 653-56.  Lake said his fatigue was stable and when he engaged in mild exertion, he became fatigued later in the day.  His pain was unchanged and more activity required more pain medication which increased his fatigue.  He was hunting and tripped and fell on the back of his head.  He did not report any loss of consciousness.  On examination, Dr. Sharp said that Lake was

chronically ill and uncomfortable.  His cardiovascular and pulmonary exams were normal.  R. 653.

On June 14, 2017, Lake saw Dr. Sharp.  R. 650-52.  Lake had fallen in his shed and landed on his side on a toolbox.  He had some shortness of breath, but denied any pain, weakness, or paresthesia in his upper extremities "although he has a significant amount of these chronically."  R. 650.  On examination, Lake was uncomfortable and had tenderness on his left lateral ribs and thoracic tenderness at T5-T9.  R. 650.  X-rays taken on June 15, 2017, showed no acute cardiopulmonary processes, no left-sided displaced rib fracture, and no pneumothorax.  R. 725.

On June 28, 2017, Lake saw Dr. Andrew Dunn, D.O., to establish care as his new primary care physician.  Lake wanted to discuss pain medication alternatives.  He said that hydrocodone and fentanyl were not working.  R. 645.  His pain varied from sharpness to numbness and stayed at the 8/10 level most days.  R. 645.  On examination, Lake's cardiovascular and pulmonary functions were normal and his cervical spine had a loss of normal lordosis, and flexion, extension, and rotation of the neck was painful in all directions.  Lake's neck had motor weakness on

extension and flexion.  Spurling's maneuver was positive.[5]  Lake's reflexes were symmetric, his upper motor exam was abnormal, and his lower motor exam was normal.  R. 646.  Dr. Dunn assessed fibromyalgia and cervical radiculopathy.  Dr. Dunn and Lake discussed use of medical marijuana as an alternative treatment.  R. 647.

On July 25, 2017, Dr. Dunn completed a Medical Source Statement form.  R. 602-05.  Dr. Dunn opined that Lake could only lift less than 10 pounds, stand and walk for less than two hours in an eight-hour workday, and sit for less than two hours in an eight-hour workday.  Dr. Dunn opined that Lake could sit for five minutes before he had to change positions, and he could stand for five minutes before he had to change positions.  He said that Lake could walk for five minutes at a time, and he said that Lake was up and down constantly.  Lake needed to be able to change positions at will, and he would need to lie down several times during an eight-hour workday.  Dr. Dunn stated that the medical findings that supported these opinions were Lake's post compressive myelopathy, bilateral upper extremity pain and weakness, and 4/5 strength.  R. 602.

---

[5] Spurling's maneuver is a test for radiculopathy in which the physician presses down on the head while the patient rotates the head laterally.  See Dorland's, at 1900.

Dr. Dunn further stated that Lake could never twist, stoop, crouch, or climb ladders, and could occasionally climb stairs.  Dr. Dunn stated that the medical findings that supported these opinions were diagnoses of spinal stenosis and arachnoiditis.  R. 603.[6]  He opined that Lake could occasionally reach, handle, and finger; but Lake could never feel or push/pull with any of his extremities.  The medical findings that supported these opinions were Lake's post cervical compressive myelopathy and 4/5 upper extremity strength.  R. 603.  Dr. Dunn said that Lake must avoid all exposure to extreme heat, extreme cold, high humidity, fumes, odors, dusts, gases, soldering fluxes, solvents, cleaners, and chemicals; and must avoid moderate exposure to perfumes.  R. 604.  He further opined that if Lake went to work he would need to be absent from work more than four days a month, would need to be off-task more than 25 percent of the time while he was at work, and would need to take unscheduled breaks "very frequently."  Lake needed the additional unscheduled breaks due to muscle weakness; chronic fatigue; pain, paresthesia, and numbness; adverse effects of his medication; and his need to lie down frequently.  R. 604-05.  Dr. Dunn stated, "Patient really can't work due to the disability he has and

---

[6] Spinal arachnoiditis is thickening and adhesions on the leptomeninges membrane covering the spinal cord.  See Dorland's, at 123.

medication he is on." Lake became disabled before his Onset Date, "Actually became disabled on 12-5-2010 when patient fell and was put in an MRI and found neck and back broken and protruding through spinal cord! Along with broken ankle and torn muscles and ligaments in his leg." R. 605 (emphasis in the original).

On August 9, 2017, Lake saw therapist Miller. Lake was waiting to get his medical marijuana card and reported that he recently went on a trip. While on the trip, he had been in substantial pain and felt "foggy." He attributed the foggy feeling to his pain medication. R. 731. Lake's mental status examination was normal, and his psychiatric condition was stable. R. 731-32.

On August 24, 2017, Lake saw cardiology nurse practitioner Rachana Adhikari, NP, for a six month follow up after the March 2017 cardiac catheterization and insertion of seven stents. Lake said that his pain medication "messes him up" and reported that he had no energy, slept more, and fell randomly. He said that Dr. Dunn prescribed medical marijuana, and he was waiting for state approval. R. 640. On examination, Lake was 5 feet 8 inches tall, weighed 236 pounds and had a BMI of 35.88. The physical examination was normal. R. 643. Adhikari assessed atherosclerotic heart disease of the native coronary artery disease without

angina pectoris and said that Lake should continue his current treatment. Adhikari noted that Lake had 13 stents and "surprisingly" his heart had a preserved ejection fraction with no significant wall abnormality.  R. 644.

On September 12, 2017, Lake saw therapist Miller.  He reported that he had not had any pain for a few days after smoking marijuana.  Miller stated that Lake was doing well with the addition of medical marijuana. Lake's mental status examination was normal, and his psychiatric condition was stable.  R. 729.

On September 13, 2017, Lake saw Dr. Dunn.  R. 636-39.  Lake said that his back pain was 9/10 and "he just came from the river and hitching up his boat and his back hurts."  He asked about the possibility of a back brace.  He used one in the past and it helped.  Lake reported that he had not smoked marijuana "very much that day" and marijuana "usually really helps" with the pain.  He wanted a reduction in the strength of his fentanyl patch.  R. 636.

On examination, Lake's cardiovascular and pulmonary exams were normal.  His cervical spine exam showed a loss of lordosis; muscle spasms on palpation on the left; pain with flexion, extension, and rotation; weakness on flexion and extension; and a positive Spurling's maneuver. Lake's reflexes were symmetric and he had an abnormal upper motor

exam and a normal lower motor exam.  Dr. Dunn assessed lumbar

spondylosis and recommended an LSO brace.  He would reduce the

dosage on Lake's fentanyl patch on the next refill. R. 636.

On September 27, 2017, Lake saw dr. Dunn.  R. 631-35.  Lake

reported that both of his thumbs locked when grabbing objects and

reported, "Pain is better on cannabis. More active. Has been shooting his

Bow more. Life is overall better he tells me. Happy."  R. 631.  On

examination, Lake's neck was supple, his pulmonary and cardiovascular

examinations were normal, his upper motor examination as abnormal, and

his lower motor examination was normal.  R. 632.  Dr. Dunn said he would

lower the fentanyl dosage on the next refill and recommended braces for

both of Lake's thumbs.  R. 633.

On December 28, 2017, Lake saw Dr. Dunn.  R. 739-43.  Lake

reported, "Pain is okay at this time."  His pain was 5/10 most days and he

was using cannabis for the pain.  He did not want to refill his fentanyl

prescription.  R. 739.  On examination, his cardiovascular and pulmonary

examinations were normal.  His cervical examination showed a loss of

lordosis; left sided muscle spasms on palpation; pain with extension,

flexion, and rotation; weakness on extension and flexion; and a positive

Spurling's Maneuver.  R. 741.  Dr. Dunn assessed cervical radiculopathy and continued to taper off Lake's fentanyl dosage.  R. 741.

<u>The Evidentiary Hearing</u>

On June 18, 2018, an Administrative Law Judge (ALJ) conducted an evidentiary hearing in Lake's case.  R. 32-72.  Lake appeared in person and with his attorney.  Vocational expert  Julie Svec also appeared by telephone.  R. 34.

Lake testified first that he had a GED and had not worked since his Onset Date October 1, 2014. He stopped working when he fell off a truck and broke his neck, mid back, and low back (the Accident).  Lake lived with his wife and step-daughter in a mobile home and also had two adult children ages 22 and 24.  He was five feet eight inches tall and weighed 228 pounds and was two and one-half inches shorter than he used to be. The doctors attributed the height loss to spinal stenosis and degenerative disc disease.  He had put on 30 pounds since October 1, 2014.  Lake gained weight because he could not do anything.  R. 40-41.

Lake had constant headaches since the Accident.  Every day he experienced nausea with these headaches and vomited at least once or twice a day.  He treated his headaches with his back pain medication and by lying down.  R. 43.

He had problems moving his neck after the Accident and his neck was hard to rotate side to side and even harder to move up and down.  He turned his body to look to the side rather than turning his neck.  If he tried to turn his neck, "It just stops."  He experienced pain "like pins and needles" when he turned his head.  R. 44.  It was harder to try to look up than down.  When he tried to look up, his neck "just stops, and there's instant pain."  R. 45.

Lake testified that he had constant pain in his neck since the Accident and described the pain as stabbing and burning and never went away.  The pain radiated down his spine and down his right arm and the radiating pain into his right arm was constant.  He had the radiating pain ever since the Accident.  The pain went into his shoulder and all the way down to his right fingertips.  The pain was "[b]urning, aching, stabbing, pins and needles."  He also had numbness and tingling in his right arm and no feeling in is right fingertips.  Lake was right-handed.  He dropped things because of the loss of feeling and he attributed the loss of feeling in his fingers to his "spinal cord injury."  The pain from anyone touching or bumping into his right arm was "excruciating."  R. 46-47.

Lake could not extend his right arm forward or reach overhead because of the pain.  He could raise his right arm "a little bit" out to the

side, but if he moved his arm too far, he experienced "Just constant pain. Shrieking pain."  His condition existed from his Onset Date to his Last Date Insured.  R.  47.

Lake had no functional difficulties with his left upper extremity.  R. 47. The pain in his back was "[c]onstant, burning, aching, nauseating pain."  R. 48.  The pain in his back radiated down into his right hip and right leg.  R. 47.  He right leg and hip felt "[n]umb, tingling, aching, pins and needles." He fell several times a week due to the numbness and pain in his right hip and leg, which was constant.  R. 48.  HIs pain interfered with his sleep and woke him up about five or six times a night.  He took more pain pills and muscle relaxers and tried to go back to sleep.  R. 49-50.

Lake treated his pain with medication, ice, and a TENS unit.  At the time of the hearing he took hydrocodone and smoked marijuana for pain. The hydrocodone made him feel "tired, drowsy, nauseated, not being able to think straight."  R. 55.  He used the TENS unit and the ice on his middle and low back.  He used the TENS unit every evening from his Onset Date to his Date Last Insured and used ice a couple of times during the day, three to four times a week.  R. 51.

Lake also lay down because of the pain.  During a typical eight-hour workday, Lake spent four to five hours lying down and took naps every day

while he was lying down.  His naps lasted two to three hours "a day at a time."  He was asleep four to five hours during a typical workday from 9:00 a.m. to 5:00 p.m.  R. 52.

Lake had a heart attack in 2009 and had a stent put into his heart. He said, however, that between his Onset Date and his Last Date Insured, he did not have any cardiac problems.  R. 53.  He used nitroglycerin medication "maybe five times" from his Onset Date to his Last Date Insured.  He used nitroglycerin when his chest pain became "excruciating" and he felt "sweating coming on" and nauseated.  R. 54.

Lake drove to the doctor went he felt up to it.  If he felt bad enough, his wife drove him.  He did not feel up to driving three to four times a week and could only drive for 15 minutes because his right leg went numb.  The right leg went numb in 15 minutes even if he was just riding in a car.  R. 57-58.  Lake did not shop or do housework and he needed help from his wife to get dressed.  She also helped him get in and out of the shower, and she helped him in the shower by scrubbing his back and his head.  R. 58.

Lake said that he could sit for five to 10 minutes, walk for five minutes, and stand for five minutes.  A gallon of milk was the heaviest weight he could lift.  R. 59.  His pain on average was 7/10 and 20 times a month the pain went higher than 7/10.  He said, "When it flares up, I go to

the emergency room, or I do everything I can to get out of pain."  R. 61.

Lake said, however, that he did not go to the emergency room 20 times a

week.  R. 62.

Vocational specialist Svec then testified.  Lake had no objections to

Svec testifying as a vocational expert.  R. 65.  Svec stated that Lake had

past relevant work as a driver.  R. 66.  The ALJ asked Svec the following

hypothetical question:

> I want you to assume an individual the claimant's age,
> education, work experience who's going to be able to perform
> sedentary work as that's defined by the regulations.  Now, once
> again, this individual is never going to be able to push or pull
> with the bilateral upper extremities.  All right, now this individual
> is never going to be able to climb ladders, ropes, or scaffolds,
> and this individual is only going to be able to occasionally climb
> ramps or stairs.  And can occasionally balance on narrow,
> slippery, or erratically moving surfaces.  Individual can
> occasionally stoop and crouch, and never kneel and never
> crawl. This individual can frequently rotate, flex, or extend the
> neck, but this individual should have no overhead reaching
> bilaterally.  But this individual can frequently handle objects,
> that is gross manipulation bilaterally.  This individual can
> frequently finger, that is fine manipulation by objects that are no
> smaller in size than a paper clip, bilaterally.  And this individual
> can frequently feel bilaterally.  Now, this individual should have
> no use of hazardous machinery.  No exposure to unshielded
> moving mechanical parts.  No driving a motor vehicle as part of
> the work function, and no exposure to unprotected heights.
> This individual is only going to be able to remember,
> understand, and carry out only simple and routine instructions
> and tasks. . . .   Now, could such an individual with any of these
> limitations perform any work in the national economy?

R. 66-67.  Svec opined that such a person could perform some sedentary jobs in the national economy.  The person could perform jobs, such as charge clerk, with 150,000 such jobs existing nationwide; telephone clerk, with 78,000 such jobs existing nationwide; and document preparer, with 86,000 such jobs existing nationwide.  R. 67.

The person could not work if his impairments caused him either to be absent from work twice a month consistently or off-task 15 percent of the time at work.  R. 68.  The person also could not work if he had an additional limitation that prohibited repetitive rotation, flexion, or extension of the neck. R. 69.  The person further could not work if he could only occasionally reach, handle and finger, but could never feel with the upper extremities. R. 70.  The hearing concluded.

<u>THE DECISION OF THE ALJ</u>

On October 29, 2018, the ALJ issued his decision.  R. 15-26.  The ALJ followed the five-step analysis set forth in Social Security Administration Regulations (Analysis).  20 C.F.R. §§ 404.1520, 416.920. Step 1 requires that the claimant not be currently engaged in substantial gainful activity.  20 C.F.R. §§ 404.1520(b), 416.920(b).  If true, Step 2 requires the claimant to have a severe impairment.  20 C.F.R. §§ 404.1520(c), 416.920(c).  If true, Step 3 requires a determination of

whether the claimant is so severely impaired that he is disabled regardless of his age, education and work experience.  20 C.F.R. §§ 404.1520(d), 416.920(d).  To meet this requirement at Step 3, the claimant's condition must meet or be equal to the criteria of one of the impairments specified in 20 C.F.R. Part 404 Subpart P, Appendix 1 (Listing).  20 C.F.R. §§ 404.1520(d), 416.920(d).  If the claimant is not so severely impaired, the ALJ proceeds to Step 4 of the Analysis.

Step 4 requires the claimant not to be able to return to his prior work considering his age, education, work experience, and Residual Functional Capacity (RFC).  20 C.F.R. §§ 404.1520(e) and (f), 416.920(e) and (f).  If the claimant cannot return to his prior work, then Step 5 requires a determination of whether the claimant is disabled considering his RFC, age, education, and past work experience.  20 C.F.R. §§ 404.1520(g), 404.1560(c), 416.920(g), 416.960(c).  The claimant has the burden of presenting evidence and proving the issues on the first four steps.  The Commissioner has the burden on the last step to present evidence that, considering the listed factors, the claimant can perform some type of gainful employment that exists in the national economy.  20 C.F.R. §§ 404.1512, 404.1560(c); Weatherbee v. Astrue, 649 F.3d 565, 569 (7th Cir. 2011); Briscoe ex rel. Taylor v. Barnhart, 425 F.3d 345, 352 (7th Cir. 2005).

The evidence also had to show that Lake was disabled before his Date Last Insured, December 31, 2016, to be entitled to Disability Benefits under Title II of the Social Security Act.  See Martinez v. Astrue, 630 F.3d 693, 699 (7th Cir. 2011).

The ALJ found that Lake met his burden at Steps 1 and 2 of the Analysis.  Lake was not engaged in substantial gainful activity, and he suffered from the severe impairments of degenerative disc disease status post-cervical fusion with radiculopathy and myelopathy, osteoarthritis, elbow degenerative joint disease, bilateral trigger thumbs, fibromyalgia, chronic pain syndrome, polyneuropathy, coronary artery disease and ischemic heart disease status post multiple stent placements, and obesity. R. 17.  The ALJ found that Lake's impairments or combination of impairments did not meet or equal any Listing.  T. 18-19.

The ALJ then determined that Lake had the following RFC:

5.  After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) except he could never push or pull with the bilateral upper extremities.  He could never kneel, crawl, or climb ladders, ropes, and scaffolds, but could occasionally climb ramps and stairs, stoop, crouch, and balance on narrow, slippery, or erratically moving surfaces. He could frequently rotate, flex, or extend the neck, but could not perform overhead reaching bilaterally. Bilaterally, he could handle objects (that is, gross manipulation) frequently, finger objects (that is, fine manipulations of items no smaller than the

size of a paperclip) frequently, and feel frequently. He could
have no use of hazardous machinery, no exposure to
unshielded moving mechanical parts or unprotected heights,
and no driving of motor vehicles as part of the work function.
He could remember, understand, and carry out only simple and
routine instructions and tasks . . . .

R. 19.   The ALJ found that the medical evidence of Lake's back

impairments and cardiac impairments supported a finding that he could

only perform a limited range of sedentary work.  Sedentary work involves

lifting no more than 10 pounds, occasionally carrying articles like files and

small tools, and standing and/or walking two hours in an eight-hour

workday.  See 20 C.F.R. § 404.1567(a); SSR 83-10, 1983 WL 31251, at *5

(January 1, 1983).  The ALJ found that the medical evidence did not

support a more limited RFC.  The ALJ relied on medical examinations that

found normal motor function, normal muscle tone, full range of motion,

negative straight leg testing, negative Romberg's sign, and intact

sensation.  R. 20-21.  The ALJ also noted that Lake treated his pain

"conservatively with medications, elbow compression bands, elbow

injections, ice, heat, elbow physical therapy, and recommendations to lose

weight to help reduce discomfort and increase range of motion and

strength."  R. 22.

The ALJ further found that Lake's testimony of more severe

limitations was not consistent with the other evidence in the record.  The

ALJ noted medical records in which Lake denied having headaches.  The

ALJ also noted that Lake's testimony was inconsistent with his statements

in the Function Reports and to his healthcare providers.  The ALJ noted

that Lake stated in his Function Reports that he drove, went out alone, paid

bills, received visitors daily, tried to attend church monthly, watched his

step-daughter's volleyball games, did small loads of laundry, and used

Facebook.  He also told his healthcare providers that he mowed his lawn

with a riding mower; engaged in boating, hunting, and shooting a bow; and

remained very active in a search and rescue team.  R. 22.  The ALJ

concluded:

> Such reports tended to suggest greater physical and mental
> abilities than claimed.  His reported need to use a cane, lie
> down or nap 4-5 hours a day, stay in bed several days a week,
> and have his family help with personal care, pet care, all
> cooking, all chores, and all shopping were not entirely
> consistent with the record as a whole.

R. 22.

The ALJ gave little weight to Dr. Dunn's Medical Source Statement.

The ALJ found that it was inconsistent with the medical records and noted

that Dr. Dunn said in his Medical Source Statement that Lake had

arachnoiditis, but no medical record mentioned arachnoiditis.  Dr. Dunn's

opinions of functional limitation were inconsistent with Lake's "minimal

complaints of side effects to providers, exams showing an alert

presentation with intact cognition, reports of managed pain with conservative treatment measures, and activities of daily living, including hunting and boating before and after the established onset date."  The ALJ also found that the ultimate question of disability was reserved to the Defendant Commissioner.  R. 24.

The ALJ also gave little weight to the opinions of state agency doctors Madison and Mitra.  Those doctors opined that Lake could engage light work, rather than the limited range of sedentary work that the ALJ found in the RFC.  The ALJ said that Lake's condition would not support a finding of an ability to engage in light work, "Rather, the record as a whole suggests the claimant is capable of no more than a limited range of sedentary work."  The ALJ similarly gave little weight to Dr. Sharp's 20-pound lifting limit in March 2015.  The ALJ found that the evidence "supported greater difficulties in lifting and carrying than what Dr. Sharp found."  R. 24.

The ALJ found at Step 4, that Lake could not perform his past relevant work as a driver.  At Step 5, the ALJ found that Lake could perform a significant number of jobs in the national economy.  The ALJ relied on the Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2, and the opinions of vocational expert Svec.  The ALJ found that Lake could

perform existing sedentary jobs such as Svec's representative examples of

charge account clerk, telephone clerk, and document preparer.  The ALJ

concluded that Lake was not disabled through his Date Last Insured.  R.

26.

Lake appealed.  On November 4, 2019, the Appeals Council denied

Lake's request for review.  The opinion of the ALJ then became the final

decision of the Defendant Commissioner.  R. 1. Lake then brought this

action for judicial review.

## ANALYSIS

This Court reviews the Decision of the Commissioner to determine

whether it is supported by substantial evidence.  Substantial evidence is

"such relevant evidence as a reasonable mind might accept as adequate"

to support the decision.  Richardson v. Perales, 402 U.S. 389, 401 (1971).

This Court must accept the findings if they are supported by substantial

evidence and may not substitute its judgment or reweigh the evidence.

Jens v. Barnhart, 347 F.3d 209, 212 (7th Cir. 2003); Delgado v. Bowen, 782

F.2d 79, 82 (7th Cir. 1986).  This Court will not review the ALJ's evaluation

of statements regarding the intensity, persistence, and limiting effect of

symptoms unless the evaluation is patently wrong and lacks any

explanation or support in the record.  See Pepper v. Colvin, 712 F.3d 351,

367 (7th Cir. 2014); Elder v. Astrue, 529 F.3d 408, 413-14 (7th Cir. 2008);

SSR 16-3p, 2017 WL 5180304, at *1 (October 25, 2017) (The Social

Security Administration no longer uses the term credibility in the evaluation

of statements regarding symptoms).  The ALJ must articulate at least

minimally his analysis of all relevant evidence.  Herron v. Shalala, 19 F.3d

329, 333 (7th Cir. 1994).  The ALJ must "build an accurate and logical

bridge from the evidence to his conclusion."  Clifford v. Apfel, 227 F.3d 863,

872 (7th Cir. 2000).

The decision of the ALJ was supported by substantial evidence.  The

ALJ limited Lake to a limited range of sedentary work in light of his back

injury and other severe impairments.  That decision was supported by the

medical records which showed significant impairment of his spine and

elbows.  Several medical records, however, also showed normal strength

or near normal strength, full range of motion, negative straight leg lifting

tests, intact sensation, and normal mental status examinations.  The ALJ

struck a balance between the evidence of impairment and the evidence of

residual capability by assigning an RFC that was limited to some, but not

all, sedentary work.  A reasonable person might accept this evidence on

which the ALJ relied to reach his conclusions.  See Richardson, 402 U.S. at

401.  The decision was supported by substantial evidence.

Lake argues that the ALJ erred in his evaluation of Dr. Dunn's opinion. Lake argues that the ALJ should have given Dr. Dunn's opinions controlling weight. The ALJ must give the opinions of a treating physician controlling weight if the opinions are supported by objective evidence and are not inconsistent with other evidence in the record. 20 C.F.R. § 404.1527(d)(2); Bauer v. Astrue, 532 F.3d 606, 608 (7th Cir. 2008).[7]

In this case, Dr. Dunn had seen Lake only one time before he opined on Lake's functional capabilities. Dr. Dunn's first visit with Lake was June 28, 2017, approximately six months after the Date Last Insured. Dr. Dunn was barely a treating physician when he rendered the opinions, and he was not a treating physician before the Date Last Insured. Moreover, the ALJ explained how Dr. Dunn's opinions were inconsistent with the evidence in the record. The ALJ explained that no evidence in the medical records supported Dr. Dunn's assertion that Lake had a diagnosis of spinal arachnoiditis. The ALJ further cited to specific examples of Lake's activities before the Date Last Insured that were inconsistent with Dr. Dunn's opinions. This case is not like the case on which Lake relies, Brown v.

---

[7] The Commissioner amended the regulations regarding the interpretations of medical evidence. The amendments, however, apply prospectively to claims filed on or after the amendment's effective date of March 27, 2017. Revisions to Rule Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844-01, at 5844-45 (January 18, 2017). As such, the amendments do not apply here.

Colvin, 845 F.3d, 247, 253 (7th Cir. 2016).  The ALJ in Brown did not cite

evidence that contradicted the doctor's opinions.  Here, the ALJ cited

contradictory evidence.  Lake also argues that the ALJ erred by giving

great weight to the opinions of state agency physicians, while giving little

weight to Dr. Dunn's opinions.  Lake is mistaken.  The ALJ gave little

weight to the opinions of state agency physicians  Drs. Madison and Mitra

as well as those of Dr. Dunn.  The ALJ did not err in his evaluation of Dr.

Dunn's opinions.

     Lake argues that the ALJ erred in his treatment of Lake's testimony.

The Court again disagrees.  The ALJ's decision to give little weight to

Lake's testimony was also supported by the evidence.  Lake testified that

he had constant headaches, threw up every day, slept four to five hours a

day, and did virtually nothing else.  The ALJ noted that Lake's statements

were inconsistent with the medical records of instances in which Lake

denied having headaches.  The ALJ noted that Lake's testimony was

inconsistent with his statements in his Function Reports and to his

healthcare providers.  Lake said in the Function Reports that he went out

alone, paid bills, received visitors daily, went to church periodically, went to

his step-daughter's volleyball games, used Facebook, and did light loads of

laundry.  Lake told healthcare providers that he hunted, boated, and

worked on a search and rescue team.  The inconsistencies supported the ALJ's decision to give Lake's testimony little weight, "[I]f an individual's statements about the intensity, persistence, and limiting effects of symptoms are inconsistent with the objective medical evidence and the other evidence, we will determine that the individual's symptoms are less likely to reduce his or her capacities to perform work-related activities." SSR 16-3p, at *8.  There was no error.

In his reply, Lake argues that Dr. Kukkar's 2014 review of an MRI, which showed severe degenerative disc disease in Lake's lumbar spine, was objective evidence of the severe pain that Lake suffered. The ALJ considered the MRI and further cited Dr. Kukkar's recommendation that Lake take the over-the-counter medication Aleve for pain rather than hydrocodone and avoid surgery as long as possible.  R. 21.  Dr. Kukkar's recommendations to take Aleve and avoid surgery provided substantial evidence for the ALJ's determination that Lake's symptoms of pain were not as severe as Lake represented.

Lake lastly argues that the ALJ's RFC determination was not supported by substantial evidence.  Lake essentially wants the Court to reweigh the evidence and give more weight to Dr. Dunn's opinions.  The Court will not reweigh the evidence.  Jens, 347 F.3d at 212; Delgado, 782

F.2d at 82.  The ALJ is the finder of fact.  He considered all the relevant evidence and decided the weight to be given to the evidence.  He minimally explained the basis for that decision.  The Court will not reverse the factual findings.  There was no error.

THEREFORE, IT IS ORDERED THAT Defendant Commissioner of Social Security's Motion for Summary Affirmance (d/e 16) is ALLOWED; Plaintiff Jeffrey E. Lake's Brief in Support of Motion for Summary Judgment (d/e 12) is DENIED; and the decision of the Commissioner is AFFIRMED. THIS CASE IS CLOSED.

ENTER:   March 8, 2021

_____ s/ *Tom Schanzle-Haskins* _____
TOM SCHANZLE-HASKINS
UNITED STATES MAGISTRATE JUDGE